

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 1:11-CR-95 |
| | ) | |
| v. | ) | Count 1: 18 U.S.C. § 371 |
| | ) | (Conspiracy) |
| MARKUS WALDER, | ) | |
| MARCO PARENTI ADAMI, | ) | |
| SUSANNE D. RÜEGG MEIER, | ) | |
| ROGER SCHAERER, | ) | |
| EMANUEL AGUSTONI, | ) | |
| MICHELE BERGANTINO, | ) | |
| ANDREAS BACHMANN, | ) | |
| a/k/a/ "Andrew Bachman", | ) | |
| a/k/a/ "Andy Bachman", and | ) | |
| JOSEF DÖRIG | ) | |
| | ) | |
| Defendants. | ) | |

## SUPERSEDING INDICTMENT

### July 2011 Term – At Alexandria

THE GRAND JURY CHARGES THAT:

## GENERAL ALLEGATIONS

At all times relevant to this Superseding Indictment:

**International Bank**

1.       An international Swiss bank organized under the laws of Switzerland and

headquartered in Zurich, Switzerland, ("International Bank"), directly and through its

subsidiaries, operated a global financial services business. As one of the biggest banks in

Switzerland and largest wealth managers in the world, International Bank provided banking,

wealth management, asset management, and investment banking services, among other services,

around the globe, including through branches located in the United States.  For decades,
International Bank operated a U.S. cross-border business through which its private bankers
provided cross-border securities-related and investment advisory services to U.S. customers who
maintained undeclared accounts at International Bank in Switzerland, the Bahamas, and other
locations outside the United States.  This cross-border business was conducted through
substantial contacts with the customers in the United States.  International Bank's managers and
bankers working in the cross-border business knew and should have known that they were aiding
and abetting U.S. customers in evading their U.S. income taxes.  As of the fall of 2008,
International Bank maintained thousands of undeclared accounts containing approximately $4
billion in total assets under management in those accounts.

2.      International Bank operated a wholly owned subsidiary that is one of the largest
private banks in Switzerland.  The wholly owned subsidiary was formed in 2007 from the merger
of four private banks and a securities dealer.  The wholly owned subsidiary operated a U.S. cross-
border business through which its private bankers provided cross-border securities-related and
investment advisory services to U.S. customers who maintained undeclared accounts at the
wholly owned subsidiary in Switzerland.  This cross-border business was conducted through
substantial contacts with the customers in the United States.  The wholly owned subsidiary's
managers and bankers working in the cross-border business knew and should have known that
they were aiding and abetting U.S. customers in evading their U.S. income taxes.

3.      In order for an entity and its bankers to effect any transaction in, or to induce or
attempt to induce the purchase or sale of, any security, that entity and its bankers were required
under U.S. law to register as a broker-dealer and as an investment adviser with the United States

Securities and Exchange Commission ("SEC"). Neither International Bank, nor the bankers engaged in its cross-border business, were registered as broker-dealers and investment advisers with the SEC.

4.     In 1997, International Bank applied to the Federal Reserve Board under section 10(a) of the International Banking Act ("IBA") (12 U.S.C. § 3107(a)) to establish representative offices in Miami, Florida; New York, New York; and, Houston, Texas. The Foreign Bank Supervision Enhancement Act of 1991 ("FBSEA"), which amended the IBA, provided that a foreign bank had to obtain the approval of the Board to establish a representative office in the United States. International Bank proposed to establish the representative offices primarily to act as liaison with private banking customers, solicit private banking business, and provide information and advice on economic conditions and investment opportunities in Switzerland. International Bank represented to the Federal Reserve Board that it had the experience and capacity to support the proposed representative offices and had established controls and procedures for the proposed representative offices to ensure compliance with U.S. law. In 1998, the Federal Reserve Board granted International Bank's application. Prior to 1998, International Bank operated representative offices in New York, Los Angeles, San Francisco, Miami, and Houston under state banking regulations. International Bank made periodic reports regarding the activities of its New York Representative Office to the Federal Reserve Bank of New York, the bank's primary regulator in the United States.

5.     In or around January 2001, International Bank entered into a Qualified Intermediary Agreement ("QI Agreement") with the Internal Revenue Service ("IRS"). The QI Agreement required the bank to verify the identity and citizenship/domicile of its customers,

through the execution of IRS Forms W-8BEN, Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding, and W-9, Request for Taxpayer Identification Number and Certification, and to withhold and pay over to the IRS taxes on certain transactions from accounts beneficially owned by U.S. taxpayers.

6.     In or around March 2001, International Bank opened an SEC-registered and U.S. tax compliant cross-border business for U.S. customers who intended to report their ownership of their offshore accounts and related income to the IRS.

7.     In or around the fall of 2008, International Bank began the process of exiting its undeclared U.S. cross-border banking business and closed its Representative Office in New York which serviced U.S. customers with undeclared accounts.

**Other Swiss Banks**

8.     A private Swiss bank organized under the laws of Switzerland ("Private Swiss Bank #1") was a family-owned private bank that was founded in 2000 and headquartered in Zurich, Switzerland that provided cross-border banking services to U.S. customers. On its website, Private Swiss Bank #1 touted its "strict policy to never open any branch or other representation outside the reach of the Swiss laws and jurisdiction . . ." because "[o]nly that way can we be certain to maintain our values – and assure that no foreign authority will ever 'bully' us into giving them up." Private Swiss Bank #1 entered into a QI Agreement with the IRS.

9.     An Israeli bank with a head office in Tel Aviv, Israel, operated a subsidiary, organized under the laws of Switzerland, with offices in Geneva and Zurich, Switzerland ("Israeli Bank") that provided cross-border banking services to U.S. customers. In or around 2001, Israeli Bank entered into a QI Agreement with the IRS.

4

10.     A private Swiss bank organized under the laws of Switzerland ("Private Swiss Bank #2") was a family-owned private bank with a head office in Zurich, Switzerland, and private banking locations in Lugano and Locarno, Switzerland, that provided cross-border banking services to U.S. customers. In or around 2001, Private Swiss Bank #2 entered into a QI Agreement with the IRS.

11.     A private Swiss bank organized under the laws of Switzerland ("Private Swiss Bank #3") owned principally by several partners, each of whom bore unlimited liability, claimed to be Switzerland's oldest bank. Swiss Bank #3 provided cross-border banking services to U.S. customers. In or around 2001, Private Swiss Bank #3 entered into a QI Agreement with the IRS.

12.     A bank that was an independent, incorporated public-law institution wholly owned by the Kanton of Zürich, Switzerland ("Kantonal Bank") provided cross-border banking services to U.S. customers. In or around 2001, Kantonal Bank entered into a QI Agreement with the IRS.

13.     An asset management firm ("Asset Management Firm #1") located in Zurich, Switzerland, opened private banking operations in 2002 under the direction of HANSRUEDI SCHUMACHER. Asset Management Firm #1 and its employees assisted U.S. customers in opening undeclared accounts at Swiss banks, including Kantonal Bank, and managed the investments in those undeclared account for the U.S. customers.

14.     An asset management firm ("Asset Management Firm #2") located in Zurich, Switzerland, was formed by former employees of Asset Management Firm #1 to assist U.S. customers in opening undeclared accounts at Swiss banks and managing the investments in those accounts for the U.S. customers.

5

**Investigation of Cross-Border Banking**

15.     As of March 23, 2009, the IRS offered the Offshore Account Voluntary

Disclosure Program ("Voluntary Disclosure Program") to U.S. taxpayers as a means for those

taxpayers to disclose their interests in undeclared accounts and avoid criminal prosecution. The

program was open until October 15, 2009. Under the Voluntary Disclosure Program, the

participants paid tax on their unreported income, a 20% accuracy penalty on the tax, and a 20%

penalty on the high balance of the undeclared accounts, together with interest.

**U.S. Income Tax & Reporting Obligations**

16.     U.S. citizens, resident aliens, and legal permanent residents had an obligation to

report to the IRS on the Schedule B of a U.S. Individual Income Tax Return, Form 1040, whether

that individual had a financial interest in, or signature authority over, a financial account in a

foreign country in a particular year by checking "Yes" or "No" in the appropriate box and

identifying the country where the account was maintained. U.S. citizens, resident aliens, and

legal permanent residents had an obligation to report all income earned from foreign bank

accounts on the tax return and to pay the taxes due on that income.

17.     U.S. citizens, resident aliens, and legal permanent residents who had a financial

interest in, or signature authority over, one or more financial accounts in a foreign country with

an aggregate value of more than $10,000 at any time during a particular year were required to file

with the Department of the Treasury a Report of Foreign Bank and Financial Accounts, Form TD

F 90-22.1 (the "FBAR"). The FBAR for the applicable year was due by June 30 of the following

year.

**Definitions**

18.     An "undeclared account" was a financial account owned by an individual subject to U.S. tax and maintained in a foreign country that had not been reported to the U.S. government on an income tax return and an FBAR.

19.     A "tax haven" was a country or territory whose institutions and laws, including bank secrecy laws, were intended to conceal financial information evidencing tax evasion from other countries.

20.     "Offshore charge, credit, and debit cards" were cards issued and caused to be issued by offshore financial institutions to holders of undeclared accounts to permit them to access the assets in the undeclared accounts while ensuring that their applications and records of transactions would be maintained offshore.

21.     A "nominee" was a person or entity that was used to conceal the true owner's identity.

## THE CONSPIRATORS

22.     Defendant MARKUS WALDER, a citizen and resident of Switzerland, was the head of North American Offshore Banking for International Bank responsible for both the declared and undeclared U.S. cross-border banking businesses. He held the title of Managing Director at International Bank. As the head of North American Offshore banking, Defendant MARKUS WALDER supervised the undeclared U.S. cross-border banking business including: teams of private bankers in Zurich and Geneva; the Representative Office in New York, New York; and the SEC-registered and IRS-compliant U.S. cross-border business. Defendant MARKUS WALDER also served as a private banker who traveled to the United States to

7

provide unlicensed and unregistered banking services and investment advice to U.S. customers who maintained undeclared accounts at International Bank. From in or around 2007 to the present, even though he continued to assist U.S. customers to evade their income tax obligations by using undeclared accounts at International Bank, defendant MARKUS WALDER served as a member of the senior management of International Bank's SEC-registered and U.S. compliant cross-border banking business, holding the title of "Director."

23.     Defendant MARCO PARENTI ADAMI, a citizen of Italy and resident of Switzerland, was a member of International Bank's senior management who supervised the Geneva-based undeclared U.S. cross-border banking business. From at least on or about 1994 to the present, he served as a private banker for International Bank, providing unlicensed and unregistered banking services and investment advice to U.S. customers who maintained undeclared accounts at International Bank.

24.     Defendant SUSANNE D. RÜEGG MEIER, a citizen and resident of Switzerland, was a member of International Bank's senior management who supervised the Zurich-based undeclared U.S. cross-border banking business. Defendant SUSANNE D. RÜEGG MEIER also served as a private banker for International Bank, providing unlicensed and unregistered banking services and investment advice to U.S. customers who maintained undeclared accounts at International Bank.

25.     Defendant ROGER SCHAERER, a dual citizen of Switzerland and the United States and a resident of the United States, was a member of International Bank's senior management who supervised the New York Representative Office from 1999 to 2008. In 2004, International Bank promoted defendant ROGER SCHAERER to the title of Director. As

International Bank's Senior Representative in the United States, defendant ROGER SCHAERER serviced the undeclared accounts of U.S. customers.

26.     Defendant EMANUEL AGUSTONI, a citizen and resident of Switzerland, was a private banker and asset manager who provided unlicensed and unregistered banking services and investment advice to U.S. customers who maintained undeclared accounts in Switzerland. From in or around the 1990s to in or around 2005, defendant EMANUEL AGUSTONI was employed as a private banker by International Bank in Zurich, Switzerland.  From in or around 2005 to in or around 2008, Private Swiss Bank #2 employed defendant EMANUEL AGUSTONI in Zurich, Switzerland as a private banker with the title of Assistant Vice President.  From in or around 2009 to the present, defendant EMANUEL AGUSTONI has worked as an independent asset manger in Zurich, Switzerland opening undeclared accounts for U.S. customers at Private Swiss Bank #1.

27.     Defendant MICHELE BERGANTINO, a citizen and resident of Switzerland, was employed by International Bank from in or around April 1983 through in or around May 2009 as a private banker in Zurich, Switzerland, providing unlicensed and unregistered banking services and investment advice to U.S. customers who maintained undeclared accounts in Switzerland. From in or around June 2009 to in or around August 2010, International Bank employed defendant MICHELE BERGANTINO as a private banker in its SEC-registered and U.S. compliant cross-border banking business.

28.     Defendant ANDREAS BACHMANN, a citizen and resident of Switzerland, was a private banker and asset manager who provided unlicensed and unregistered banking services and investment advice to U.S. customers who maintained undeclared accounts at banks in

Switzerland.  From in or around the 1990s to in or around 2007, he worked as a private banker for a wholly owned subsidiary of International Bank.  From in or around 2007 through in or around 2009, defendant ANDREAS BACHMANN worked for Asset Management Firm #1 in Zurich, Switzerland, as an asset manager where he continued to open and manage undeclared accounts for U.S. customers.  From in or around July 2009 through the present, defendant ANDREAS BACHMANN with several other partners formed Asset Management Firm #2 in Zurich, Switzerland, where he worked as an asset manager opening and managing undeclared accounts for U.S. customers.

29.     Defendant JOSEF DÖRIG was the President, Chief Executive and Chairman of the Board of a wholly owned subsidiary of International Bank that served as a trust and asset management company that managed undeclared accounts for U.S. customers that were opened and maintained in the names of nominee tax haven entities.  In or around 1997, he left the wholly owned subsidiary of International Bank and founded a Swiss trust company that was used to open and maintain nominee tax haven entities for U.S. customers who sought to conceal their assets and income from U.S. authorities.  International Bank identified and promoted defendant JOSEF DÖRIG to customers as a preferred provider for creating and maintaining nominee tax haven entities.

## COUNT ONE
**(Conspiracy)**

THE GRAND JURY FURTHER CHARGES THAT:

30.     The general allegations are incorporated in this Count.

### The Conspiracy and Its Object

31.     From in or around the 1960s to the present, the exact dates being unknown to the

Grand Jury, in the Eastern District of Virginia and elsewhere, defendants

**MARKUS WALDER**
**MARCO PARENTI ADAMI,**
**SUSANNE RÜEGG MEIER,**
**ROGER SCHAERER,**
**EMANUEL AGUSTONI,**
**MICHELE BERGANTINO,**
**ANDREAS BACHMANN, and**
**JOSEF DÖRIG,**

(collectively "Defendants") did unlawfully, voluntarily, intentionally, and knowingly conspire,

combine, confederate, and agree together and with each other and with others both known and

unknown to the Grand Jury to commit the following offense against the United States:  to

defraud the United States for the purpose of impeding, impairing, obstructing, and defeating the

lawful government functions of the Internal Revenue Service of the Treasury Department in the

ascertainment, computation, assessment, and collection of revenue:  to wit, U.S. income taxes, in

violation of Title 18, United States Code, Section 371.

### Manner and Means of the Conspiracy

Among the manner and means by which the Defendants and their conspirators would and

did carry out the conspiracy were the following:

11

32.     International Bank operated a Representative Office in New York, New York that was utilized to provide unlicensed and unregistered banking services and investment advice to U.S. customers who maintained undeclared accounts in Switzerland;

33.     Defendants MARKUS WALDER and ROGER SCHAERER, their conspirators and others made false statements and provided misleading information to the Federal Reserve Bank of New York regarding the International Bank's undeclared U.S. cross-border banking business and the role the Representative Office in New York played in that business;

34.     The Defendants, their conspirators and others caused International Bank to make false statements and provided misleading information to the IRS regarding International Bank's compliance with the terms of the QI Agreement.

35.     International Bank maintained correspondent bank accounts in the United States through which the Defendants, their conspirators and others conducted financial transactions in furtherance of its cross-border tax evasion scheme;

36.     The Defendants and their conspirators caused U.S. customers to execute forms that directed International Bank not to disclose their identities to the IRS;

37.     The Defendants and their conspirators caused U.S. customers to open and maintain both declared and undeclared accounts at International Bank so that U.S. authorities would likely not suspect the customer had an undeclared account, which would aid in concealing the customer's offshore assets and income from the IRS;

38.     The Defendants and their conspirators assisted U.S. customers to close their undeclared accounts at International Bank and convert marketable securities into precious metals;

12

39.     The Defendants and their conspirators provided cash in the United States to U.S. customers as withdrawals from their undeclared accounts at International Bank in Switzerland;

40.     The Defendants and their conspirators solicited cash deposits in the United States from U.S. customers with undeclared accounts at International Bank in Switzerland;

41.     The Defendants and their conspirators solicited U.S. customers to open undeclared accounts because Swiss bank secrecy would permit them to conceal their ownership of accounts at International Bank and other Swiss banks;

42.     The Defendants and their conspirators set up, and caused to be set up, and utilized, and caused to be utilized, nominee tax haven entities to open undeclared accounts;

43.     International Bank's managers and bankers, in violation of International Bank's QI Agreement, knowingly accepted IRS Forms W-8BEN, or the bank's substitute forms, that falsely stated under penalties of perjury that the beneficial owner of the account was not subject to U.S. taxation;

44.     The Defendants and their conspirators caused U.S. customers to travel outside the United States, to destinations including Switzerland and the Bahamas, to provide banking services and investment advice related to their undeclared accounts;

45.     The Defendants and their conspirators provided unlicensed and unregistered banking services and investment advice to U.S. customers in person while on travel to the United States and by mailings, email, and telephone calls to and from the United States;

46.     Certain U.S. customers filed false and fraudulent U.S. Individual Income Tax Returns, Forms 1040, which failed to report their respective interests in their undeclared accounts and the related income;

47.      U.S. customers failed to file and otherwise report their undeclared accounts on FBARs;

48.      The Defendants and their conspirators advised U.S. customers to structure, and caused U.S. customers to structure, withdrawals from their undeclared accounts in amounts less than $10,000 in an attempt to conceal their undeclared accounts and the transactions from U.S. authorities;

49.      The Defendants and their conspirators advised U.S. customers to utilize offshore charge, credit, and debit cards linked to their undeclared accounts and did provide such cards, including cards issued by American Express, Visa, and Maestro;

50.      The Defendants and their conspirators advised U.S. customers not to maintain in the United States account records related to their undeclared accounts;

51.      The Defendants and their conspirators caused International Bank, Private Swiss Bank #1, Private Swiss Bank # 2, Private Swiss Bank # 3, Kantonal Bank, Asset Management Firm #1, and Asset Management Firm #2 to retain, in Switzerland, account records related to the U.S. customers' undeclared accounts;

52.      The Defendants and their conspirators had statements and other account records of undeclared accounts maintained by U.S. customers at International Bank sent by e-mail and facsimile from Switzerland to the Representative Office in New York, New York, so that customers with undeclared accounts could review the documents;

53.      The Defendants and their conspirators destroyed, and caused to be destroyed, statements and other account records of undeclared accounts maintained by U.S. customers at

International Bank that were sent by e-mail and facsimile from Switzerland to the Representative Office in New York, New York;

54.     The Defendants and their conspirators discouraged U.S. customers from disclosing their undeclared accounts to the IRS through the Voluntary Disclosure Program;

55.     The Defendants and their conspirators encouraged and assisted U.S. customers to transfer their undeclared accounts at International Bank to other banks in Switzerland, including Private Swiss Bank #1, Private Swiss Bank # 2, Private Swiss Bank # 3, Kantonal Bank, and Israeli Bank, and to a bank in Hong Kong as a means to continue to conceal the assets and income in undeclared accounts; and

56.     The Defendants, their conspirators and others caused U.S. customers who inherited undeclared accounts at International Bank to open new undeclared accounts and transfer into those accounts the funds from the inherited accounts.

## Overt Acts

In furtherance of the conspiracy, and to effect the object thereof, the following overt acts were committed in the Eastern District of Virginia, and elsewhere:

57.     On or about December 13, 2005, while operating an illegal U.S. cross-border banking business, International Bank made a filing to the Federal Reserve Bank of New York that concealed its participation in the tax evasion scheme in that International Bank stated that if a member of the Representative Office is "asked about overseas account services" or "asked for assistance in the opening of an overseas account" the Representative "must decline the Customer's request" "[i]f the client indicates that he/she intends to avoid paying taxes" as "[i]t is the policy of [International Bank] not to provide any assistance in the evasion of taxes."

58.     On or about December 6, 2007, while operating an illegal U.S. cross-border banking business, International Bank attempted to conceal its participation in the tax evasion scheme in that International Bank made a filing to the Federal Reserve Bank of New York regarding its U.S. Anti-Money Laundering Program for its New York Representative Office that reported that the bank's Global Business Conduct Manual states that "employees must not engage in activity that could be viewed as knowingly assisting a client in . . . misleading local or foreign authorities or any tax authority by means of incomplete or missing information."

**Customers 1 and 2**

59.     In or about July 20, 1990, Customer 1, a U.S. citizen and resident of Plandome Manor, New York, opened an undeclared account at International Bank in the name of a nominee tax haven entity.

60.     In or about September 17, 2000, Customer 1 closed the existing account at International Bank and transferred the contents to a new account opened at International Bank in the name of a nominee tax haven entity that was formed by defendant JOSEF DÖRIG.

61.     In or around 2001, Customer 2, the spouse of Customer 1, met with defendant MARKUS WALDER at a hotel in New York, New York, to discuss the undeclared  at International Bank.

62.     In or around 2002, Customer 2 met with defendant MARKUS WALDER at a hotel in New York, New York to discuss the undeclared account at International Bank, including discussing portfolio investment decisions.

63.     In or around 2008, Customer 2 met with defendant MARKUS WALDER at a hotel in New York, New York to discuss the undeclared account at International Bank, including discussing portfolio investment decisions.

64.     In or around November 2008, defendant ROGER SCHAERER telephoned Customer 2 and informed Customer 2 that defendant MARKUS WALDER was no longer traveling to the United States, and that defendant MARKUS WALDER would meet with Customer 2 in Switzerland to close the undeclared account at International Bank.

65.     In or around November 2008, at a meeting arranged by defendant MARKUS WALDER at the office of defendant JOSEF DÖRIG in Zurich, Switzerland, Customer 2 met with defendant MARKUS WALDER, defendant JOSEF DÖRIG, and two Italian men who offered to transfer Customer 2's undeclared account from International Bank to another private bank in order to conceal Customer 2's ownership of the assets and income.

**Customer 3**

66.     In or around 1989, Customer 3, a U.S. citizen and resident of New York, New York, opened an undeclared account at International Bank in Zurich, Switzerland with funds inherited from an undeclared account at International Bank that Customer 3 inherited from Customer 3's father.

67.     In or around 1989, a relative informed Customer 3 that if Customer 3 repatriated the funds from the undeclared account to the United States, Customer 3 would expose the entire family to possible prosecution for failure to report to the IRS their undeclared accounts and the income derived from them.

17

68.     In or around 2001, at a meeting in a café in New York, New York, defendant MARKUS WALDER gave Customer 3 cash in an amount less than $10,000 as a withdrawal from Customer 3's undeclared account at International Bank.

69.     In or around 2004, defendant MARKUS WALDER advised Customer 3 to close the existing undeclared account at International Bank and transfer the contents to a new undeclared account to be opened in the name of a nominee tax haven entity in order to conceal Customer 3's ownership of the new account.

70.     In or around 2004, Customer 3 closed the existing undeclared account at International Bank and transferred the assets to a new undeclared account opened in the name of a nominee tax haven entity that was created and managed by an individual suggested by defendant MARKUS WALDER.

71.     In or around October of 2008, at a meeting in Zurich, Switzerland, Customer 3 asked defendant MARKUS WALDER if Customer 3 should be concerned about Swiss bank secrecy given the U.S. government's investigation of UBS, and defendant MARKUS WALDER responded by telling Customer 3 that there was nothing to be concerned about.

72.     In or around December of 2008, at a meeting in Zurich, Switzerland, defendant MARKUS WALDER informed Customer 3 that International Bank could not maintain the undeclared account because International Bank was fearful of enforcement action by U.S. authorities.

73.     In or around December 2008, defendant MARKUS WALDER advised Customer 3 to transfer the undeclared account from International Bank to Private Bank #3.

18

**Customer 4**

74.     In or around 2005, at a party in Palm Beach, Florida, Customer 4, then a legal permanent resident of the U.S. residing in Palm Beach Gardens, Florida, was introduced to defendant MARKUS WALDER who identified himself as an employee of International Bank in Zurich, Switzerland.

75.     In or around 2005, Customer 4 telephoned a banker with International Bank's SEC-registered U.S. tax compliant business in Miami, Florida ("Banker A"), to request contact information for defendant MARKUS WALDER as Customer 4 expressed interested in meeting with defendant MARKUS WALDER in Florida to discuss transferring Customer 4's undeclared account at UBS to International Bank in Switzerland at which time Banker A asked Customer 4 about the assets in the UBS account, which were less than $2 million, and Banker A assured Customer 4 that defendant MARKUS WALDER would make contact in the near future.

76.     In or around 2005, several days after the conversation with Banker A, defendant MARKUS WALDER telephoned from Switzerland to Customer 4 in the United States to discuss opening an undeclared account with International Bank.

77.     On or about November 23, 2006, at a hotel meeting in Miami, Florida, defendant MARKUS WALDER provided Customer 4 with documents to open an undeclared account at International Bank in Switzerland, which Customer 4 executed in the presence of defendant MARKUS WALDER.

78.     On or about July 8, 2008, Customer 4 sent a letter from the United States to defendant MARKUS WALDER in Switzerland in which Customer 4 enclosed a copy of an

19

article regarding the U.S. government's investigation of UBS's illegal cross-border banking business and asked the following question:

> The enclosed article, which I wanted to share with you, appeared last week in our newspaper and I am certain that there are many issues thereto how UBS and the Swiss Government react to such request and which consequences will result thereof.
>
> Is this a beginning of the end for UBS and/or the entire Swiss bank secrecy in general?

79.     On or about June 12, 2009, Customer 4 used funds in the undeclared account at International Bank to purchase 16 one-kilogram bars of gold, at a cost of $483,744, and had the precious metal stored in a safe deposit box at International Bank in Zurich, Switzerland.

80.     On or about July 14, 2009, Customer 4 closed the undeclared account at International Bank and received 469,640 Swiss Francs in cash and had the cash stored in a safe deposit box at International Bank in Zurich, Switzerland.

**Customer 5**

81.     In or about August 2006, in Zurich, Switzerland, Customer 5, a naturalized U.S. citizen residing in Charlottesville, Virginia, opened an undeclared account at International Bank in Switzerland.

82.     On or about August 16, 2006, Customer 5 departed from Dulles International Airport, in the Eastern District of Virginia, on a flight bound for Zurich, Switzerland, to meet with an International Bank banker in Zurich, Switzerland, to discuss the undeclared account.

83.     On or about April 15, 2007, Customer 5 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2006 that failed to report the undeclared account and related income.

20

84.    On or about July 7, 2008, Customer 5 departed from Dulles International Airport, in the Eastern District of Virginia, on a flight bound for Zurich, Switzerland, to meet with an International Bank banker in Zurich, Switzerland, to discuss the undeclared account.

85.    On or about June 12, 2009, Customer 5 departed from Dulles International Airport, in the Eastern District of Virginia, on a flight bound for Zurich, Switzerland, to meet with an International Bank banker in Zurich, Switzerland, to discuss the undeclared account.

**Customer 6**

86.    In or around 2003, Customer 6, a U.S. citizen and resident of San Francisco, California, opened an undeclared account at International Bank in Zurich, Switzerland, and deposited into that account funds from Customer 6's deceased father's account at International Bank.

87.    In or around 2003, defendant MARKUS WALDER telephoned Customer 6 in the United States and informed Customer 6 that he would be the relationship manager for Customer 6's undeclared account at International Bank.

88.    On or about April 12, 2003, defendant MARKUS WALDER caused to be sent via DHL from Switzerland to Customer 6 in San Francisco, California, three bank checks issued by International Bank, each in the amount of $4,206.98, funded with withdrawals from Customer 6's undeclared account at International Bank.

89.    In or around 2005, at a meeting at a restaurant in San Francisco, California, defendant MARKUS WALDER showed Customer 6 a copy of a statement for Customer 6's undeclared account at International Bank and discussed account performance with Customer 6.

21

90.     In or around May 2005, defendant MARKUS WALDER caused to be sent via DHL from Switzerland to Customer 6 in San Francisco, California, four bank checks issued by International Bank, in the amounts of $3,037.87, $2,925.25, $3,925.25 and $3,237.87, funded with withdrawals from Customer 6's undeclared account at International Bank.

91.     On or about May 11, 2006, defendant MARKUS WALDER caused to be sent via DHL from Switzerland to Customer 6 in San Francisco, California, five bank checks issued by International Bank, in the amounts of $3,324.12, $3,736.18; $13,024.12, $13,024.12, and $13,024.12, funded with withdrawals from Customer 6's undeclared account at International Bank.

92.     In or around 2007, at a meeting at a restaurant in San Francisco, California, defendant MARKUS WALDER showed Customer 6 a copy of a statement for Customer 6's undeclared account at International Bank and discussed account performance.

93.     In or around 2009, during a conversation with Customer 6 about the U.S. government's investigation of UBS, defendant MARKUS WALDER advised Customer 6 that International Bank may have to exit the undeclared cross-border banking business with U.S. customers and conceded that International Bank had some existing U.S. customers who complied with U.S. tax law.

**Customer 7**

94.     In or around 2002, at a meeting in Nassau, Bahamas, a private banker at International Bank informed Customer 7, a U.S. citizen and resident of West Palm Beach, Florida, that International Bank would transfer Customer 7's undeclared account from the

22

Bahamas to either Zurich, Switzerland or the Cayman Islands as International Bank could not maintain the undeclared account in the Bahamas any longer.

95.     On or about November 11, 2003, at a meeting in Nassau, Bahamas, Customer 7 executed documents to open an undeclared account at International Bank in Zurich, Switzerland, including a document that stated that Customer 7 did not wish to have International Bank disclose Customer 7's ownership of the account to the IRS, and transferred into that account the contents of Customer 7's undeclared account at International Bank in the Bahamas.

96.     In or about 2003, at a meeting in Jupiter, Florida, defendant SUSANNE RÜEGG MEIER informed Customer 7 that she would send to Customer 7 in the United States cash withdrawn from the undeclared account at International Bank in the form of bank checks payable to Customer 7.

97.     On or about August 19, 2004, defendant SUSANNE RÜEGG MEIER caused to be sent via DHL from Switzerland to Customer 7 in Palm Beach Gardens, Florida, two bank checks issued by International Bank, each in the amount of $9,923.43, funded with withdrawals from Customer 7's undeclared account at International Bank.

98.     On or about May 19, 2005, defendant SUSANNE RÜEGG MEIER caused to be sent via DHL from Switzerland to Customer 7 in Palm Beach Gardens, Florida, two bank checks issued by International Bank, each in the amount of $9,923.46, funded with withdrawals from Customer 7's undeclared account at International Bank.

99.     On or about October 30, 2008, defendant SUSANNE RÜEGG MEIER caused to be sent via DHL from Switzerland to Customer 7 in Palm Beach Gardens, Florida, two bank

23

checks issued by International Bank, each in the amount of $9,931.22, funded with withdrawals from Customer 7's undeclared account at International Bank.

**Customer 8**

100.    In or about 1995, at a meeting at an International Bank office in Miami, Florida, Customer 8, a U.S. citizen and resident of Owings Mills, Maryland, signed documents that authorized him to make changes to Customer 8's parents' undeclared account at International Bank.

101.    In or around 2005,  at the suggestion of defendant SUSANNE RÜEGG MEIER, Customer 8 met with defendant ROGER SCHAERER at the Representative Office of International Bank in New York to add signatories to the undeclared account and to review account statements.

102.    In or around 2005, at the Representative Office of International Bank in New York City, on the advice of defendant SUSANNE RÜEGG MEIER, Customer 8 met with defendant ROGER SCHAERER to review account statements for the undeclared account at which time defendant ROGER SCHAERER explained that the account statements were not kept in the United States, but sent via either computer or fax from Switzerland to the Representative Office shortly before the meeting and shredded at the meeting's conclusion.

103.    In or around early 2009, during a phone call from Switzerland to the United States, defendant SUSANNE RÜEGG MEIER informed Customer 8 he had to close the undeclared account at International Bank within 60 days and transfer the funds either to the United States or to another bank in Switzerland.

24

**Customer 9**

104. In or around 2000, Customer 9, a U.S. citizen and resident of Geneva, New York, received a phone call in the United States from defendant SUSANNE RÜEGG MEIER regarding the power of attorney that Customer 9 held over the undeclared account maintained by the parents of Customer 9 at International Bank.

105. In or around 2002, at a meeting at the Representative Office of International Bank in New York City to discuss and determine investment strategy for the undeclared account, defendant SUSANNE RÜEGG MEIER advised Customer 9 to open an account at International Bank's SEC-registered and U.S. tax compliant business if Customer 9 wished to invest in U.S. securities.

106. In or around 2003, at a meeting at the Representative Office of International Bank in New York City to discuss and determine investment strategy for the undeclared account, defendant SUSANNE RÜEGG MEIER advised Customer 9 to open an account at International Bank's SEC-registered and U.S. tax compliant business if Customer 9 wished to invest in U.S. securities.

107. In or around 2006, defendant SUSANNE RÜEGG MEIER advised Customer 9 to open an undeclared account at International Bank in the name of nominee tax haven entity and suggested that Customer 9 meet with defendant JOSEF DÖRIG.

108. In or around 2006, defendant JOSEF DÖRIG created, or caused to be created, a nominee tax haven entity for Customer 9 and opened, or caused to be opened, an undeclared account at International Bank in Zurich, Switzerland the name of that entity.

109.    In or around 2009, defendant SUSANNE RÜEGG MEIER telephoned Customer 9 in the United States and informed Customer 9 that the undeclared account held in the name of the nominee tax haven entity at International Bank had to be closed.

110.    In or around 2009, defendant JOSEF DÖRIG closed the undeclared account that he opened, and caused to be opened, on behalf of Customer 9 in the name of the nominee tax haven entity at International Bank on and transferred the contents to a new account in the name of the nominee tax haven entity at Private Swiss Bank # 3.

**Customers 10 and 11**

111.    On or about 2001, Customer 10, a U.S. citizen and resident of Clinton Corners, New York, began assisting Customer 11, a U.S. citizen and resident of Wayne, New Jersey, to manage the undeclared account held in the name of Customer 11 – the parent of Customer 10 – at International Bank.

112.    On or about 2007, defendant SUSANNE RÜEGG MEIER met with Customers 10 and 11 at a hotel in New York, New York, to discuss the investment strategy for the undeclared account held in the name of Customer 11 at International Bank.

113.    On or about 2007, defendant SUSANNE RÜEGG MEIER met with Customer 10 at International Bank in Zurich, Switzerland, to discuss the investment strategy for the undeclared account held in the name of Customer 11 at International Bank at which time defendant SUSANNE RÜEGG MEIER advised Customer 10 to open a second undeclared account in the name of a nominee tax haven entity in order to conceal Customer 11's ownership of assets and income.

114.    On or about 2007, defendants SUSANNE RÜEGG MEIER and JOSEF DÖRIG met with Customer 10 at International Bank in Zurich, Switzerland, to open a second undeclared account in the name of a nominee tax haven entity in order to conceal Customer 11's ownership of assets and income from U.S. authorities.

115.    In or around 2007, defendant JOSEF DÖRIG created, or caused to be created, a nominee tax haven entity for Customer 11 and opened, or caused to be opened, an undeclared account at International Bank in Zurich, Switzerland in the name of that entity.

116.    On or about 2008, defendant SUSANNE RÜEGG MEIER met with Customers 10 and 11 at a hotel in New York, New York, to discuss investment strategies for the undeclared accounts at International Bank.

**Customers 12, 13 and 14**

117.    On or about September 4, 1997, a married couple – Customers 12, a U.S. citizen and resident of Bellevue, Washington, and 13, a legal permanent resident of the U.S. and resident of Bellevue, Washington – jointly opened an undeclared account at a wholly owned subsidiary of International Bank in Zurich, Switzerland.

118.    On or about June 27, 2007, defendant ANDREAS BACHMANN assisted Customers 12 and 13 to close their undeclared account at a wholly owned subsidiary of International Bank and transferred the contents to an undeclared account at Kantonal Bank in Zurich, Switzerland that defendant ANDREAS BACHMANN opened on behalf of Customers 12 and 13.

119.    In or around September 2009, in a phone call to Customer 13 in the United States, defendant ANDREAS BACHMANN asked to meet with Customer 13 in Vancouver, Canada, as defendant ANDREAS BACHMANN refused to travel into the United States.

120.    In or around September 2009, at a meeting at a hotel in Vancouver, Canada, defendant ANDREAS BACHMANN informed Customer 13 and Customer 14, the adult child of Customers 12 and 13, that Kantonal Bank intended to close the undeclared account as U.S. authorities were placing great pressure on Swiss financial institutions and defendant ANDREAS BACHMANN informed Customers 13 and 14 that he could assist them to open an undeclared account at another Swiss bank or they could transfer the account to a different Swiss bank and maintain it as a declared account.

121.    In or around September 2009, at a meeting at a hotel in Vancouver, Canada, defendant ANDREAS BACHMANN provided Customers 13 and 14 with documents to open a undeclared account at one Swiss bank and a declared account at another Swiss bank.

122.    In or around September 2009, at a meeting at a hotel in Vancouver, Canada, Customers 13 and 14 executed documents to open an undeclared account at one Swiss bank and a declared account at another Swiss bank and returned them to defendant ANDREAS BACHMANN.

**Customer 15**

123.    In or around the late 1990s, Customer 15, a U.S. citizen and resident of New York, New York, met in Zurich, Switzerland with defendant ANDREAS BACHMANN to open an undeclared account at a wholly owned subsidiary of International Bank at which time

defendant ANDREAS BACHMANN advised Customer 15 to open the account in the name of a nominee entity in order to conceal Customer 15's ownership of the account.

124.    On or about December 6, 2000,  on behalf of Customer 15, defendant JOSEF DÖRIG caused to be opened an undeclared account at a wholly owned subsidiary of International Bank in the name of a nominee tax haven entity.

125.    On or about December 6, 2000, defendant JOSEF DÖRIG provided to a wholly owned subsidiary of International Bank a Form W-8BEN that falsely stated that the nominee tax haven entity was the beneficial owner of the undeclared account owned by Customer 15.

126.    In or around 2001, at a meeting in New York City, Customer 15 gave defendant ANDREAS BACHMANN approximately $20,000 in cash to deposit in the undeclared account at a wholly owned subsidiary of International Bank, which defendant ANDREAS BACHMANN had requested as he had another customer who wished to make a withdrawal from an account in Switzerland.

127.    On or about May 30, 2003, defendant JOSEF DÖRIG provided to a wholly owned subsidiary of International Bank a Form W-8BEN that falsely stated that a nominee tax haven entity was the beneficial owner of the account owned by Customer 15.

**Customer 16**

128.    In or around 1972, Customer 16, a legal permanent resident of the United States, opened an undeclared account at a wholly owned subsidiary of International Bank.

129.    In or around 1972, on behalf of Customer 16, defendant JOSEF DÖRIG caused to be opened an undeclared account in the name of a nominee tax haven entity (i.e., a trust) at a wholly owned subsidiary of International Bank.

130. In or around 1999, defendant ANDREAS BACHMANN met with Customer 16 in California to discuss the undeclared account at a wholly owned subsidiary of International Bank and showed Customer 16 a copy of the statement of the undeclared account.

131. On or about September 7, 2000, on behalf of Customer 16, defendant JOSEF DÖRIG caused to be opened an undeclared account in the name of a nominee tax haven entity (i.e., a corporation) at a wholly owned subsidiary of International Bank after defendant JOSEF DÖRIG advised Customer 16 that a corporation would make it more difficult for U.S. authorities to discover that the wholly owned subsidiary of International Bank was conducting business with a U.S. customer.

132. On or about September 22, 2000, defendant JOSEF DÖRIG provided a wholly owned subsidiary of International Bank a Form W-8BEN that falsely stated that a nominee tax haven entity was the beneficial owner of the account owned by Customer 16.

133. On or about May 30, 2003, defendant JOSEF DÖRIG provided a wholly owned subsidiary of International Bank a Form W-8BEN that falsely stated that a nominee tax haven entity was the beneficial owner of the account owned by Customer 16.

134. On or about January 1, 2006, defendant JOSEF DÖRIG provided a wholly owned subsidiary of International Bank a Form W-8BEN that falsely stated that a nominee tax haven entity was the beneficial owner of the account owned by Customer 16.

135. In or around 2006, defendant ANDREAS BACHMANN met with Customer 16 in California to discuss the undeclared account at a wholly owned subsidiary of International Bank and showed Customer 16 a copy of the statement of the undeclared account.

136.    In or around 2006, defendant ANDREAS BACHMANN told Customer 16 that he was leaving a wholly owned subsidiary of International Bank because he believed that the safety of his customers' banking information was in jeopardy and would be employed at Asset Management Firm # 1 as an investment manager.

137.    In or around 2006, after advising Customer 16 that Kantonal Bank would not be under the same pressure as a wholly owned subsidiary of International Bank, defendant ANDREAS BACHMAN transferred Customer 16's undeclared account at a wholly owned subsidiary of International Bank to a new undeclared account at Kantonal Bank.

138.    In or around August 2009, defendant ANDREAS BACHMAN told Customer 16 he was leaving Asset Management Firm # 1 to work as a partner at a new company, Asset Management Firm # 2, and offered to transfer Customer 16's undeclared account from Kantonal Bank to a Swiss bank that had a relationship with Asset Management Firm # 2.

**Customer 17**

139.    In or around 1983, Customer 17 opened an undeclared account at a wholly owned subsidiary of International Bank in Zurich, Switzerland and deposited into the account $125,000 in cash.

140.    In or around 1984, Customer 17 met in Fort Meyers, Florida with a banker from a wholly owned subsidiary of International Bank to discuss the investments in the undeclared account.

141.    Prior to September 11, 2001, Customer 17 secretly transported approximately $250,000 in cash from the Untied States to Switzerland by concealing the money beneath Customer 17's clothes in nylon pantyhose that was wrapped around Customer 17's body.

31

142.    In or around 2001, Customer 17 deposited $250,000 in cash into the undeclared account at a wholly owned subsidiary of International Bank in Switzerland.

**Customer 18**

143.    In or about 2000, at a meeting in Anaheim, California, to discuss Customer 18's declared account at International Bank in Zurich, Switzerland, an International Bank banker provided Customer 18 with documents to open a separate, undeclared account at International Bank in Zurich, Switzerland.

144.    In or about 2000, Customer 18 sent via private courier from Anaheim, California to Zurich, Switzerland, executed documents to open an undeclared account at International Bank in Zurich, Switzerland.

145.    In or around 2002, at a meeting in Anaheim, California, a banker from International Bank met with Customer 18 to discuss the investments in the declared and undeclared accounts at which time the banker provided Customer 18 with a paper copy of a statement for the undeclared account.

146.    In or around July 2009, Customer 18 received a telephone call in the United States from a banker with International Bank in Switzerland who stated that Customer 18 had to close his undeclared account.

**Customer 19**

147.    In or around July 1996, Customer 19, a U.S. citizen and resident of Stuart, Florida, inherited an undeclared account at International Bank.

148.    On or about January 23, 1997, Customer 19 made a withdrawal of $4,000 from the undeclared account at International Bank at the Representative Office of International Bank in Miami, Florida.

149.    In or around 1999, Customer 19 made a withdrawal of approximately $4,000 from the undeclared account at International Bank at the Representative Office of International Bank in Miami, Florida.

**Customer 20**

150.    In or around 1993, Customer 20, a U.S. citizen and resident of Palm Beach, Florida, opened an undeclared account at International Bank and made an initial deposit into that account at an office of International Bank in New York, New York.

151.    In or around 1993, defendant MARCO PARENTI ADAMI telephoned Customer 20 in the United States to introduce himself as the banker responsible for Customer 20's undeclared account at International Bank.

152.    Beginning in or around the 1990s and continuing through in or around 2008, defendant MARCO PARENTI ADAMI mailed copies of statements for Customer 20's undeclared account at International Bank to Customer 20's home on the island of Saint Barths, an overseas collectivity of France, because defendant MARCO PARENTI ADAMI advised against mailing bank documents to the home of Customer 20 in Palm Beach, Florida.

153.    In or around the late 1990s, defendant MARCO PARENTI ADAMI met in Florida with Customer 20 to provide investment advice and discuss Customer 20's undeclared account at International Bank.

154.    On or about October 11, 2006, defendant MARCO PARENTI ADAMI met with Customer 20 at a hotel in New York, New York, to discuss the undeclared account at International Bank.

155.    On or about October 12, 2006, Customer 20 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

156.    In or around 2008, defendant MARCO PARENTI ADAMI met with Customer 20 in the Bahamas to discuss the undeclared account at International Bank because defendant MARCO PARENTI ADAMI was reluctant to travel to the United States.

157.    In or around 2008, Customer 20 met with defendant MARCO PARENTI ADAMI in Geneva, Switzerland, to close the undeclared account at International Bank at which time defendant MARCO PARENTI ADAMI recommended transferring the undeclared account to an Israeli bank with a branch in Geneva or to a bank in Hong Kong and not repatriating the funds back to the United States in order to evade U.S. income taxes.

**Customer 21**

158.    In or around 2004, Customer 21, a U.S. citizen and resident of Norwood, New Jersey, at the direction of defendant MARCO PARENTI ADAMI, met with defendant ROGER SCHAERER at International Bank's representative office in New York, New York, to execute bank forms to make Customer 21 a beneficial owner of an undeclared account at International Bank owned by the mother of Customer 21.

34

159.    On or about April 15, 2006, Customer 21 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

160.    In or around 2007, Customer 21 met with defendant ROGER SCHAERER at International Bank's representative office in New York, New York, to execute bank forms to add another individual's name to the undeclared account at International Bank.

161.    In or around September 2007, in response to Customer 21's request to close the undeclared account at International Bank, defendant MARCO PARENTI ADAMI, via telephone, advised Customer 21 that the undeclared account could be transferred to another offshore bank and that he could locate a Swiss lawyer to assist in the transfer.

**Customers 22 and 23**

162.    In or around 1983, on the advice of an International Bank banker, Customer 22, an Iranian national residing in Beverly Hills, California, opened an undeclared account at International Bank in Switzerland in the name of a fictitious person.

163.    On or about October 12, 2006, Customer 22 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

164.    In or around 2007, defendant MARCO PARENTI ADAMI sent a fax to Customer 22 in the United States requesting to meet to discuss the undeclared account.

165.    In or around the Fall of 2007, defendant MARCO PARENTI ADAMI met at a hotel in Beverly Hills, California, with Customer 22 and, Customer 23, a U.S. citizen residing in Beverly Hills, California, who was the son of Customer 22 and a beneficial owner of the

35

undeclared account, at which time defendant MARCO PARENTI ADAMI presented them with bank forms to close the undeclared account and to open a new undeclared account at International Bank.

166.    In or around December 2008, Customer 23 met with defendant MARCO PARENTI ADAMI and another International Bank banker in Geneva, Switzerland.  After the meeting, the International Bank banker introduced Customer 23 to a Swiss attorney who instructed Customer 23 that if Customer 23 wished to maintain the undeclared account as a "secret" undeclared account then Customer 23 would have to create a trust to hold the money.

167.    In or around July 2009, during a meeting in Paris, France, the International Bank banker informed Customer 23 that Customer 23 had to close the undeclared account at International Bank but that Customer 23 could transfer the account to a private bank in Switzerland instead of repatriating the funds to the United States.

**Customer 24**

168.    In or around 1994, Customer 24, a U.S. citizen and resident of Beverly Hills, California, opened an undeclared account at International Bank in Geneva, Switzerland, at which time Customer 24 met defendant MARCO PARENTI ADAMI.

169.    In or around, 1997, on the advice of defendant MARCO PARENTI ADAMI, Customer 24 opened an undeclared account at International Bank in the name of a nominee tax haven entity.

170.    In or around 1997, Customer 24 met with defendant MARCO PARENTI ADAMI at a hotel in Los Angeles, California, at which time defendant MARCO PARENTI ADAMI

provided account updates and copies of statements for the undeclared account that did not identify the account holder.

171. In or around 2005, Customer 24 met with defendant MARCO PARENTI ADAMI at a hotel in Los Angeles, California, at which time defendant MARCO PARENTI ADAMI provided account updates and copies of statements for the undeclared that did not identify the account holder.

172. On or about September 16, 2006, Customer 24 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

173. In or around 2009, on the advice of defendant MARCO PARENTI ADAMI, Customer 24 closed the undeclared account at International Bank and transferred it to a new undeclared account at Israeli Bank in Switzerland.

**Customer 25**

174. In or around 2003, defendant MARCO PARENTI ADAMI met with Customer 25, a naturalized U.S. citizen residing in La Jolla, California, and discussed Customer 25's undeclared account at International Bank and provided Customer 25 with a copy of a bank statement for the account.

175. On or about April 15, 2006, Customer 25 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

**Customers 26 and 27**

176.   In or around 1953, Customer 26, a U.S. citizen and resident of Elizabeth, New Jersey, opened an undeclared account at International Bank in Basel, Switzerland.

177.   On or about March 3, 1988, in response to a request from Customer 26 to receive in the United States cash from the undeclared account, an International Bank banker mailed a letter from Switzerland to Customer 26 in Elizabeth, New Jersey, in which an International Bank banker provided the status of the account, recommended a new investment strategy, stated that the bank would not transfer cash from Switzerland to the United States as it did not wish to comply with U.S. reporting requirements, and advised that the account holder could obtain the funds in Switzerland, or, in the alternative, offered "[m]aybe our people at [International Bank] in New York (100 Wall Street) can help you."

178.   In or about 2002, defendant EMANUEL AGUSTONI called from New York, New York to Customer 27, a U.S. citizen and resident of Ossining, New York, at Customer 27's home to discuss the undeclared account at International Bank that Customer 27 inherited upon the death of Customer 26 in 1998.

179.   On or about July 6, 2002, defendant EMANUEL AGUSTONI mailed to Customer 27 in the United States a copy of defendant ROGER SCHAERER's business card and instructed Customer 27 that defendant ROGER SCHAERER would be Customer 27's contact in New York.

180.   In or about July 2002, on the advice of defendant EMANUEL AGUSTONI, Customer 27 transferred the contents of Customer 27's undeclared account into a new undeclared account, opened in Customer 27's name, at International Bank.

181.    On or about November 4, 2002, defendant EMANUEL AGUSTONI mailed from Switzerland to Customer 27 in Ossining, New York, account opening documents for Customer 27's undeclared account with instructions that to mail the executed documents either to him in Switzerland or to defendant ROGER SCHAERER at International Bank's representative office in New York, New York.

182.    In or around May 2004, defendant EMANUEL AGUSTONI met with Customer 27 at a hotel in New York, New York, to review statements for Customer 27's undeclared account and discuss investment strategy.

183.    On or about April 16, 2005, defendant EMANUEL AGUSTONI called from Switzerland to Customer 27 in Ossining, New York, and unsuccessfully solicited Customer 27 to close the undeclared account at International Bank and transfer it to Private Swiss Bank # 2.

184.    In or around December 2005, defendant EMANUEL AGUSTONI mailed from Switzerland to Customer 27 in Ossining, New York, a greeting card in which he proposed to meet with Customer 27 and provided his email address at Private Swiss Bank # 2.

185.    On or about April 15, 2006, Customer 27 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

186.    In or around Spring 2009, defendant EMANUEL AGUSTONI called from Switzerland to Customer 27 in the United States and solicited Customer 27 to close the undeclared account at International Bank and transfer it to Private Swiss Bank # 2 and inquired whether Customer 27 was aware of the Department of Justice's criminal investigation of UBS.

187.    In or around August 2009, Customer 27 met with an International Bank banker in Zurich, Switzerland, to close the undeclared account at which time the banker suggested that rather than repatriate the funds to the U.S. that he transfer the account to another Swiss bank.

**Customers 28 and 29**

188.    In or around 2002, defendants ROGER SCHAERER and EMANUEL AGUSTONI met with Customer 28, a U.S. citizen and resident of New York, New York, and Customer 29, a U.S. citizen and resident of Palm Desert, California, at International Bank's representative office in New York, New York, to open undeclared accounts at International Bank.

189.    In or around June 2002, in Zurich, Switzerland, on the advice of defendant EMANUEL AGUSTONI, Customer 28 opened an undeclared account in the name of a nominee tax haven entity at International Bank.

190.    In or around 2002, defendant EMANUEL AGUSTONI sent via DHL from Switzerland to Customer 28 in New York, New York, an American Express charge card and a Maestro debit card linked to Customer 28's undeclared account at International Bank with the instruction that Customer 28 limit the use of the cards to times when Customer 28 was in Europe.

191.    Beginning in or about 2003, and continuing through 2008, Customer 28 periodically met with defendant ROGER SCHAERER in New York, New York, to discuss the performance of the undeclared accounts at International Bank.

192.    In or around 2003, Customer 28 met with defendant EMANUEL AGUSTONI in Zurich, Switzerland, to open an undeclared account at International Bank.

193.    In or around 2003, in Zurich, Switzerland, defendant EMANUEL AGUSTONI provided Customer 29 with an American Express charge card and Maestro debit card linked to the undeclared account and instructed that Customer 29 only use the charge card and debit card in Europe.

194.    In or around 2003, in Zurich, Switzerland, defendant EMANUEL AGUSTONI informed Customer 28 that International Bank would send money from the undeclared account to the United States in the form of a bank check but advised that Customer 28 should not receive individual checks in excess of $10,000 in order to avoid the suspicion of Customer 28's U.S. bank.

195.    In or about February 12, 2003, defendant EMANUEL AGUSTONI caused to be sent via DHL from Switzerland to Customer 28 in New York, New York, cash withdrawn from the undeclared account at International Bank in the form of a bank check payable to Customer 28 in the amount of $5,400 and a bank check payable to Customer 28's spouse in the amount of $4,534.62.

196.    In or about March 2004, Customer 28 contacted International Bank officials at the representative office in New York, New York and directed them to make available for withdrawal funds from the undeclared account at an International Bank office in Zurich, Switzerland.

197.    On or about March 16, 2004, after making a request to bankers at International Bank's representative office in New York, New York, Customer 28 withdrew $20,000 in cash from the undeclared account at an International Bank office in Zurich, Switzerland.

41

198.    In or around 2005, defendant EMANUEL AGUSTONI met with Customer 29 in Switzerland and solicited Customer 29 to close the undeclared account at International Bank and transfer it to Private Swiss Bank # 2.

199.    In or about January 12, 2006, an International Bank banker caused to be sent via DHL from Switzerland to Customer 28 in New York, New York, cash withdrawn from the undeclared account at International Bank in the form of a bank check payable to Customer 28 in the amount of $4,876.64 and a bank check payable to Customer 28's spouse in the amount of $5,176.68.

200.    On or about April 15, 2006, Customer 28 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

201.    On or about April 15, 2006, Customer 29 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

202.    In or around December 2008, Customer 28 contacted International Bank officials at the Representative Office in New York, New York, and directed them to make available for withdrawal funds from the undeclared account at an International Bank office in Nassau, Bahamas.

203.    On or about December 17, 2008, after making a request to bankers at International Bank's representative office in New York, New York, Customer 28 withdrew $20,000 in cash from the undeclared account at an International Bank office in Nassau, Bahamas.

204.    In or about March 5, 2009, an International Bank banker caused to be sent via DHL from Switzerland to Customer 28 in New York, New York, cash withdrawn from the undeclared account at International Bank in the form of a bank check payable to Customer 28 in the amount of $2,613.63 and a bank check payable to Customer 28's spouse in the amount of $2,463.63.

205.    In or around 2009, in Zurich, Switzerland, International Bank bankers informed Customer 28 that Customer 28 had to close the undeclared account and advised Customer 28 to contact defendant EMANUEL AGUSTONI regarding transferring the undeclared account to another Swiss bank.

206.    In or around 2009, defendant EMANUEL AGUSTONI met with Customer 29 at a hotel in New York, New York, and solicited Customer 29 to close the undeclared account at International Bank and transfer it to another Swiss bank.

**Customers 30, 31, 32 and 33**

207.    In or around the late 1960s, Customers 30 and 31, a married couple who were U.S. citizens and residents of Pittsburgh, Pennsylvania, opened an undeclared account in their own names at International Bank in Switzerland.

208.    On or about June 18, 2003, Customers 30 and 31 spoke by telephone from an International Bank office in Nassau, Bahamas, with defendant EMANUEL AGUSTONI in Switzerland regarding the undeclared account.

209.    On or about June 18, 2003, at a International Bank office in Nassau, Bahamas, Customer 32, the child of Customers 30 and 31, executed a bank form giving her signature authority over her parents' undeclared account.

43

210.   In or around late-2003, on the instruction of defendant EMANUEL AGUSTONI, Customer 32 met with defendant ROGER SCHAERER at International Bank's representative office in New York, New York, regarding the undeclared account.

211.   In or around Spring 2004, in Zurich, Switzerland, on the advice of defendant EMANUEL AGUSTONI, Customers 30 and 31 closed their undeclared account at International Bank and opened a new undeclared account in the name of a nominee tax haven entity.

212.   On or about April 15, 2006, Customers 30 and 31 jointly filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

213.   On or about July 3, 2008, defendant EMANUEL AGUSTONI mailed from Switzerland to Customers 30 and 31 in Pittsburgh, Pennsylvania, bank forms to open an undeclared account in the name of the nominee tax haven entity at Private Swiss Bank # 2.

214.   In or around January 2009, Customers 30 and 31 closed their undeclared account at International Bank and transferred it to Private Swiss Bank # 2.

215.   In or around May 2009, at a meeting at the home of Customers 30 and 31 in Pittsburgh, Pennsylvania, defendant EMANUEL AGUSTONI informed Customers 30 and 31 of the Department of Justice's criminal investigation of UBS and advised them to close their undeclared account at Private Swiss Bank # 2 and open a new account in the name of the nominee tax haven entity at Private Swiss Bank # 1.

216.   On or around July 2009, Customers 30 and 31 closed the undeclared account at Private Swiss Bank # 2 and transferred it to Private Swiss Bank # 1.

44

217.    In or around Summer 2009, Customer 33, the child of 30 and 31, spoke with

defendant EMANUEL AGUSTONI over the telephone at which time defendant

EMANUEL AGUSTONI discouraged the participation of Customers 30, 31, 32, and 33 in the

Voluntary Disclosure Program.

**Customer 34**

218.    In or around the 1990s, Customer 34, a legal permanent resident of the United

States residing in Oakland, New Jersey, met with defendant EMANUEL AGUSTONI in the

office of defendant ROGER SCHAERER at International Bank's representative office in New

York, New York, at which time defendant EMANUEL AGUSTONI advised Customer 34 to

open an undeclared account at International Bank in the name of a nominee tax haven entity.

219.    In or around the 1990s, an International Bank banker working at International

Bank's representative office in New York, New York, traveled to Customer 34's home in

Oakland, New Jersey, and had Customer 34 sign bank forms to open an undeclared account at

International Bank in the name of a nominee tax haven entity.

220.    On or about May 1, 2006, Customer 34 filed with the IRS a false and fraudulent

U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the

undeclared account and related income.

**Customer 35**

221.    In or around 2002, in Zurich, Switzerland, in a meeting to discuss an undeclared

account held in the name of a nominee tax haven entity, Customer 35, a naturalized U.S. citizen

residing in Miami Beach, Florida, was shown a copy of an account statement by defendant

45

MICHELE BERGANTINO and advised that defendant ROGER SCHAERER worked for International Bank in the United States and would be able to assist Customer 35 with banking.

222.     On or about July 13, 2006, Customer 35 filed with the IRS a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for tax year 2005 that failed to report the undeclared account and related income.

223.     In or around September 2008, in Zurich, Switzerland, in response to Customer 35's statement that Customer 35 was a U.S. resident and a question about Customer 35's U.S. tax reporting obligations, defendant MICHELE BERGANTINO advised Customer 35 that she had no reporting obligations as she had originally opened the undeclared account with an Iranian passport and, as such, International Bank would have recorded in its files that Customer 35 was not a U.S. taxpayer.

46

(All in violation of Title 18, United States Code, Section 371.)

A TRUE BILL

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office

_____
FOREPERSON

NEIL H. MACBRIDE                         JOHN A. DICCICO
United States Attorney                   Principal Deputy Assistant Attorney
Eastern District of Virginia                 General
                                         Tax Division

By: _____    By: _____
      Mark D. Lytle                          Kevin M. Downing
      Assistant U.S. Attorney                John E. Sullivan
                                             Senior Litigation Counsel
                                             Mark F. Daly
                                             Michelle M. Petersen
                                             Melissa S. Siskind
                                             Tino M. Lisella
                                             Trial Attorneys

47